Good morning. May it please the Court, I'd like to try and reserve five minutes for rebuttal if possible. Fifty years ago, Congress enacted contribution and expenditure limits for federal candidates, and in response, the Supreme Court in Buckley allowed the contribution limits, but held that the expenditure limits violated First Amendment rights. In the years that have followed, contribution limits have crept lower and lower every year. And for much of this time, courts have deferred to the legislative acts and upheld whatever limits legislative bodies enacted until those bodies started going too far. That's where Randall v. Sorrell marked a turning point in Supreme Court precedents relating to contribution limits. After Randall, courts started to discriminate those limits, albeit a little bit slowly. This Court, in Thompson v. Hebden, upheld the Alaska $500 contribution limit in a very deferential opinion to that limit, which was then reversed by the Supreme Court. And on remand, this Court then rejected those contribution limits and went back to- That was a statewide contribution limit, correct? And this is just citywide? That is correct. Does that make a difference? It does not. How do you expect that the limits for statewide wouldn't have to be more generous than for local? As the limits creep downward, they start to turn into an expenditure limit because the objective here is to limit quid pro quo corruption. And it defies logic to suggest that anybody is going to be corrupted by such a limit so small. It dovetails into a recent case issued after a briefing completed here. It's notable. I don't know that it's significant, but it's out of the Fifth Circuit. A criminal case, U.S. v. Hamilton, decided on August 23, 2022, 46 F. 4th, 389, in a related denial for petition for rehearing in Banque, February 17, 2023, and a dissent by judge. What's the relevance of that case? I confess I haven't read. So what is it? It's a federal bribery conviction where the jury instruction did not include an instruction for a finding of quid pro quo corruption. Does that have to do with the campaign? It's a Justice Ho's dissent there focused on how you can have somebody giving tens of thousands of dollars to an officeholder for personal consumption, and a conviction requires a finding of quid pro quo corruption. However, we have campaign finance statutes that can impose criminal penalties for hundreds of dollars when the purpose of those contributions is not for the candidate's personal benefit, but for encouraging political speech and communicating with voters. And I think Judge Ho's dissent there just kind of illustrated that weird anomaly as the Fifth Circuit sent this case back for retrial with an explicit instruction to find quid pro quo corruption, as opposed to just the fact of these tens of thousands of dollars of payments violated the law. But the city doesn't have to come forward here with actual proof of prior corruption in that sense, right? I mean, they point to this scandal that happened back in 2010 or so. I can't remember the exact date. You know, that suggested that certainly the public had reason to be concerned about what was going on in terms of money being funneled to officeholders. And so, you know, this measure is in response to that. And it seems to me that our cases say that that's an adequate basis to at least get past that first step, right? That there was an important interest that needed to be addressed, and then we could get into what you want to talk about, I guess, whether the limits are closely drawn to that interest. But are you saying that there's just no basis for the city to have enacted any limits at all? Is that the problem? It was inadequately supported, yes, because looking at that report carefully, it dealt with improper expenditures primarily by city staff, who were basically using city funds to take expensive trips and buy expensive meals. And there was no quid pro quo corruption issues. And I acknowledge that the standard is relatively low for how much evidence of the governmental interest that the government must provide. I think even with that low threshold, the city hasn't gotten there, because they are relying on this more than a decade's old report that doesn't even relate to quid pro quo corruption. And we have more recent Supreme Court precedent in McCutcheon that says, ingratiation, access, House of Respect to Citizens United, are not the type of governmental interests that would sustain a quid pro quo type of corruption. Let me ask a question. If there is in the record this PowerPoint put together by the city of Oxnard on Measure B, and some of the final slides relate to Oxnard elections campaign contributions, an example of the size and volume of campaign contributions for one candidate over the past several years. Who is this one candidate who is referred to in this? Is it Mr. Starr? It is. It couldn't be anybody else. Okay. So, in other words, in the very PowerPoint by which they're proposing to adopt this, they single him out as the problem they're trying to get rid of. Correct. So, why is that a legitimate? Maybe I'm asking the wrong party, but you have to have a legitimate government interest to have a campaign finance restriction. And if the stated objective of your campaign finance interest in your own PowerPoint is to squelch a particular citizen who's annoying, why is that a legitimate interest in the analysis at all? It's not. And that goes back to the only time the city of Oxnard ever mentioned an interest in quid pro quo corruption is in the language of the measure itself, presumably written by their attorneys who understand what they would need to try and make a measure bulletproof. But then once they wrote it and they put it on the ballot, city staff and everything about the campaign was focused on equalizing access to city government for individuals who are perceived to have fewer resources and limiting the coercive influence of large contributions, which the Supreme Court has said are not quid pro quo corruption. And that just kind of shows the totality of the circumstances of the city's campaign and the interests that they're talking about where they haven't even met the relatively small burden of what is needed to support their interest. If there's no further questions on the interest, I'll move on to whether it's... I think we should address the interest. The interest is that there was a campaign of corruption on the city council. It was investigated, and city council members were determined to be using money inappropriately. So now the council has decided, and let's keep Mr. Starr out of it for the moment, the council has now decided that political contributions should be kept at $500 to prohibit council members from getting their hands on excess cash and engaging in the same type of corruption that had troubled them in the past, correct? That's, as I understand it, the proffered reason for the campaign finance regulation here. I think that is mostly correct with respect to the proffered reason for the ordinance, but I think it is incorrect as to whether that reason is supportable by the underlying evidence. It wasn't that city council members were taking excess cash from third parties and using it for their own purpose. It was that those city council members, for lack of a better term, were stealing city money and using it for their own benefit. It had nothing to do with campaigns, campaign contributions, or special interest influence. Everything about that was primarily staff, but also a few council members who were... They were taking gifts, right, from people who had interests in city business and the like, and that's also what was addressed in this measure were gift reforms, right? Yeah, there were some inferences about gifts that, if I recall correctly, were not necessarily supportable in part because of the lack of record keeping, but the DA report really focused on a couple of different things, and the first part of it was not the gifts, but the actual taxpayer funds. City council members, the city manager, they would take luxury trips to New York and submit expense reports to the city, and the city would pay for those with their own money, with the taxpayer money. And that was the crux of that report, and that is why it is so improper to rely on that report to support allegations that there is a problem with quid pro quo corruption or even its appearance in the city. Looking to the Randall analysis, the first step is the danger signs, and there's two here. The first is the Supreme Court has never upheld the limit as low as $500, and two, Randall talks about whether the limits are lower than those in comparable states. We'll say let's look at comparable cities here, and Oxnard's limit is in the lower tier of limits in comparably sized cities, and this is where we have the deceptive sleight of hand in Dr. Kusser's expert report where his analysis is limited only to the cities whose contribution limits support his hypothesis. I have a quick question on that. I'm not a former Supreme Court law clerk, so you can help me understand. In reading Randall, I thought Justice Breyer's opinion on these danger signs, if you will, seemed to be rather case-specific there, and I'm wondering as a circuit court whether or not does that trigger a test that a circuit court has to look at when reviewing local campaign finance violations here. And I don't mean some of those things. I don't have them right in front of me, but some of those things are very specific to the finance regulation contemplated by the Randall court. I would submit that the circuit courts should exercise some discretion to look at the validity of the measure and whether it's closely drawn, regardless of whether there are any danger signs. However, following Randall, if those are a requirement and they are a test, then the limits here satisfy that test because they are lower substantially than other jurisdictions of comparable size. I think the fact of the way the city went about that deception and trying to conceal that fact from the district judge just increases the danger there of what really is underneath the surface, what are they trying to hide. And having seen those danger signs. I guess what I'm asking in essence is whether or not there are other danger signs that weren't specifically set forth by Justice Breyer here, that weren't set forth by Justice Breyer but that would apply here to trigger a Randall analysis. I understand your question now. And I think if we were to look for other danger signs, I think one would be the inference that Measure B was specifically targeted at reducing the influence of a singular person in the city. And to get to the Randall factors, I think I only have time to really focus on one. Just a point of information question, which is on the issue of indexing. The measure does provide for indexing, but as I read it, the indexing doesn't become effective unless there's a resolution of the city council. Am I reading that correctly or am I mistaken? Unfortunately, I'm going to have to try to answer that question on rebuttal because I don't know the answer off the top of my head, but I think I'll be able to look it up. And I would suggest that the CPI index is one of the less important factors to consider in light of all of the other danger signs. Looking at the factors focusing on special justification, this limit is so low, and it has such a minimal likelihood of selling their soul for $500, $750. It just is implausible that that would happen. So what is the special justification for a limit so low? It can't be the district attorney's report because that's so nebulous, it doesn't even relate to quid pro quo corruption. I might see some of this differently if there was a significant scandal involving real pay-to-play issues where city council members accepted campaign contributions as bribes in exchange for votes, but that hasn't happened here. It rarely happens. The Hamilton example I mentioned earlier is the more typical example of this type of corruption where the money goes straight into the bank account of the politician without having to go through campaign finance reporting and things that are going to be disclosed. If somebody wants to be corrupt, there's much better ways to do it than campaign contributions. You had started, and I wanted to hear what you had to say about the expert use of funny math. Can you address that? Because it seemed perfectly sensible to me the way the expert analyzed where Oxnard's limits fall in relation to other cities. The assertion was that Oxnard's limits are in the median of comparably sized cities, and there was, I believe it was some 60 cities that are comparably sized. About half of them had no limit whatsoever, and half of them that did. And so after acknowledging that universe of cities, the expert said, okay, well, these other cities that are comparably sized, they don't have a limit at all, so let's just forget about them. How else, what else would you do? If you're going to try to figure out where Oxnard falls, doesn't it make sense to compare them to other cities that have decided to enact contribution limits? What else are you going to compare it to? It presupposes that cities should enact campaign contribution limits, and the cities that have not done so, I think, should be deemed to have affirmatively decided that they do not need a limit. I'm just saying from a math standpoint, if there's no limit imposed, how would you do the comparison? You can rank them. What? Rank the cities in terms of, instead of looking at an average contribution size, rank the cities as to where they stand highest and lowest. And rather than being in the middle, Oxnard, I believe, is sixth lowest in one category and twelfth lowest in another out of this universe. Has the Supreme Court said that you're supposed, when you do this comparison, you're supposed to take into account other jurisdictions that don't have limits at all? It says comparably sized cities, and comparably sized cities necessarily includes every city, not just those that have enacted limits. With that, I'd like to save the slightly more than a minute left for Roboto. Yeah, we'll make sure you have enough time for Roboto. Let's hear from the city. Good morning. May it please the court, Holly Quatley on behalf of the city of Oxnard. Not surprisingly, we urge you to affirm the trial court's granting of the city's motion for summary judgment and her denial of the plaintiffs. Essentially, at its core, plaintiff is arguing that a $500 contribution limit should be deemed unconstitutional per se. And that is contrary to our Supreme Court's authority, beginning with Buckley, all the way through here. Let me start with the same question I asked your opposing counsel, which is this PowerPoint which has this chart at the back with illustrative examples and then has another page to one candidate. Are these numbers referring to Mr. Starr? I don't know for sure, but I believe he is that candidate. I believe so. So the city adopts a campaign finance measure and said the reason why we need it is this person, because this is what he's done. And it's pretty clear from the record that he's a person that the city government finds aggravating. And so how is this a legitimate interest? The motivation for this is not some, oh, they were spending too much money report. The motivation is we want to stop this guy. And how can we possibly say that that's a legitimate interest for First Amendment purposes, to we want to put a stop to this? Sure, Judge Collins. In fact, that was not, there were other motivations that the city had that were included in the evidence here. And one of them, in fact, is that DA's investigation report. And though the plaintiff would invite the court to disregard it as inapplicable, that respectfully I would urge that that would be error. Because, in fact, it does include examples of quid pro quo issues regarding gifts. And, for example, I would, among the many references in there. Before you lay that out, so here are my concerns that you might want to, that you're about to address perhaps with regard to the city's justification. The Ventura County DA's investigation went on in 2010. The report was issued in 2012. And whereas there were gifts, there was travel, there were excessive, there was excessive spending done by council members using city funds. There was no, to my reading of that report, there was no analysis of any abusive campaign contributions. And the profit reason in response to that report comes eight years later when Mr. Starr is making, I think someone said a nuisance, or making the council uncomfortable. So it seems to me that the reason claim could be considered pretextual, based on those three factors that I just mentioned. And with respect, Your Honor, I disagree. I think there is sufficient evidence to establish that it is not pretextual at all. The report came out in 2012. Just as a reminder, even though, as you point out, it didn't raise any campaign finance allegations, there were allegations of gifts being made to council members, even if we put aside the significant issues about staff, focusing on council members. And there is one example in the record at ER 281 where the DA found a junket to Napa where the mayor flew on a private jet provided by an individual. The individual paid for that person's hotel. And then within three months later, the mayor, of taking this trip, the mayor, as part of the senior member of the utilities task force, ultimately recommended that an entity associated with that individual be a finalist to negotiate the city's recycling facility. So this does create enough to clear the threshold for an important governmental interest, protecting quid pro quo and the appearance of it. What do we do about the fact that we know that one of the factors motivating the city council appears to be illegitimate? How do we resolve that fact? I don't know that it's illegitimate to, as part of the information you're providing, as to give an example of what a proposed limit, the effect it would have. I don't believe that is illegitimate. If we took out that PowerPoint page, for example, and all the facts remain the same, I think that is sufficient evidence to support. But it has an other-than-that Mrs. Lincoln quality to it. I mean, that's a pretty significant thing to put in the record, that one person who is well-known in the city, and he's the poster child given for why we need this to basically stop him from getting any more campaign contributions from out of state and from big donors. Well, I would say that another, in addition to the DA report, is that if we go to the Randall factors, both the danger signs and then the later factors, if a danger sign is present, which I think the trial court correctly found it wasn't, that an analysis of those factors can mitigate against the concern you have here. And that because it is closely drawn and it doesn't raise the danger signs, and even if giving plaintiffs' claims the most generous treatment you can, you would look at the five factors and the limits drawn here satisfy those factors. So I think those can mitigate against the concern you have. This is different than a case where a city did not have the corruption scandal that the DA went through. This is different than a case where the city adopts the regulations and does not put it to the voters. This is more like the Shrink Missouri issue where this was put to the voters and Shrink Missouri noted that voter approval of limits and reform can in fact be evidence of the perception of corruption that is a legitimate interest for the city to pursue. Is this a case where we would, you know, because it involves First Amendment interests, we would involve, we would apply the Bose Corp standard of independent examination of the record? I think that that would apply only to the extent, I think it would be more under the standard, motion for summary judgment standard where if the facts are undisputed, then you can apply the law to those undisputed facts. I think really the test we've got to follow here from the court is what's laid out in the evolution of cases and really where Randall is where we look to, to make that analysis. And here the trial court determined there were no, the danger signs outlined in Randall were absent. For example, did the limit, was it set per election cycle or was it confined to each election? Here the limit is per election. Does it apply to political party contributions? Nope, it doesn't. Here are the limits the lowest in the nation and I would urge that the proper comparison is to cities, to similar jurisdictions because to your first question, to plaintiff's counsel, it is a difference that the Alaska limit that was considered was a statewide limit and here we're talking about limits in a city, the population of 200,000 registered voters of around 100,000 and then it gets even further subdivided as you get down to the city council district level. To answer the question I asked your opposing counsel about how the Measure B works on the adjustment for inflation, as I read the language of the ordinance, it seemed that the adjustment made by the city clerk would not become effective unless and until there was a resolution of the city council approving it. Am I reading that correctly or incorrectly? Yes, it is to be adjusted. The city clerk is obligated to make the adjustment and then the adjustment is effective upon adoption by resolution of the city council. If they declined to adopt it, they could vote it down or just not move on it? Well, there's no evidence that that has occurred here. I'm just trying to understand how the law works. I don't believe they could refuse to adopt it. They would be then subject to a state writ of mandate claim forcing them to comply with their own code. So a city council can bind a future vote of a future city council? I thought the law, at least federally, Congress can't bind itself to vote for something in the future. It can bind itself to make CPI or inflationary adjustments in the future and if it fails to do so, someone can bring, because that's a ministerial act. The way it is phrased in the ordinance is a ministerial act and there's no evidence that they failed to do it. In fact, the first time they are to do it, to begin that process, per the code, the ordinance, is February of 2023. And I don't know, you won't need to call me any extra record evidence, but there's no evidence that they have not done so. It's ministerial. I know it would be judicially noticeable. Did they approve it? They are in the process of approving that and I can tell you what the increases are, but they are, according to us, the clerk calculated it based on the index from the code. So, you know, I do think that those adjustments address, and it's ministerial, they don't have the choice to ignore it, Your Honor, and that those are examples of, you know, a lack of danger signs here. And that in terms of the jurisdictions we compare to in the expert's report, it makes total sense that we are going to compare apples to apples. We're going to compare cities to cities and not cities to states. So to ask whether this limit was below anything previously upheld is too narrow for a meaningful evaluation of local contribution limits. Quick question. Given the stakes here, I'm just curious what your position is. My understanding is that the district court entertained summary judgment motions from both sides based on all of the evidence that was discovered and ruled in favor of your client. Wouldn't, and let's agree, if you will agree, maybe you won't, but let's agree that the threshold issue is whether or not the reason for the ordinance measure B was to target Mr. Starr or to promote good government based on the 2012 AG's report. Why not deny summary judgment on both grounds and let the jury decide based on trial evidence what the answer to that question is? Isn't that a factual issue that 12 people could answer better than us? Well, I do think that the judge made the right decision here. Of course he did. Of course I did. Aside from that, why don't we define the question that I posited as one factually based that should be a jury question resolved at trial? Well, I definitely do believe that if this court determines there's a tribal issue of fact, it should go back to the trial court and then the parties would have to handle resolution as it unfolded then. Okay. Picking up on the second bucket of randle factors, even if you assume that there are some danger signs in this campaign contribution ordinance, you then turn and do, again, it's a holistic examination of factors to determine whether the limit that was set is otherwise unconstitutional. And one of the first factors is whether the limit renders a candidate unable to run an effective campaign. And the evidence here, which I believe is uncontradicted, is that a candidate could run an effective campaign with these limits. The experts' analysis lays that out based on the 2018 campaign, which was the first campaign after the city moved to districts, and compared the spending there to the one in 2020. And it demonstrated an effective campaign could be run. The only evidence to the contrary was some deposition testimony that the president of moving Oxnard forward provided saying that it just wasn't worth his time to spend soliciting and gathering and asking for contributions, those $500. The testimony was not, I can't run an effective campaign. The testimony was, it's not worth my time. And that is not the standard, as we pointed out in our papers. The standard is not that you have to do it differently doesn't mean that it's unconstitutional. I ask a question about the ordinance's coverage of political committees, because it also applies to contributions or loans to, quote, all political committees or broad-based political committees controlled by the candidate. How, I take it your position is that that does not apply to ballot measure committees, but where do you get that from, the words of that? We get that, Your Honor, from that, if it's a contribution to committees of that candidate, or controlled by that candidate. But, in fact, in combination with the language here, which was construed by the trial court, with the city attorney's impartial analysis that went to the voters, statutorily required analysis, that went to the voters and made clear that this was not a limit on contributions to ballot measures. I know I was in the pamphlet that went to the voters with this measure. It was, Your Honor. Is that, that's in the record? Yes, Your Honor. So, with the few minutes I have left, commenting on one thing, of course, is that the aggregate contribution limits, it's something that the McCutcheon court, the limits here are distinguishable from those in the McCutcheon court. The McCutcheon court said that base limits remain available and can be constitutional, but aggregate limits on those facts, in that case, could not. And Measure B here doesn't present those same issues. It is a base limit thing. It does not limit contributions to all other candidates. And for all those reasons and what we put in our brief, we would urge the court to confirm, affirm. Thank you. Great. Thank you very much. Let's put three minutes on the clock, if that would please. All right. Thank you. I promised to get back to Judge Collins' question and wanted to get there first. And I generally agree with the city's representations there with respect to the CPI adjustment. It's a mandatory duty that is implemented by a resolution. And if they fail to do it, they probably would be hearing from my client. So you agree that that would be subject to a written mandate, that the Superior Court could order the city council to approve them? Yeah, without digging deeper into some nuances of that, that would be my starting point. As far as all of the danger signs are concerned, the fact that the limits are so low, the fact that the Supreme Court has never looked at a limit that low, I think those danger signs, as well as others that the court might want to consider, warrant a deeper analysis into whether the measure is closely drawn. And that's where, in addition to arguments made in the brief, I'll just continue to focus on the special justification or the lack thereof. In looking at the evolution of cases, Randall kind of really started the change. But look at Citizens United and McCutcheon in FEC versus Cruz. And as we kind of go through these, the level of protection for First Amendment rights has increased over time with, just as Thomas said, concurring or dissenting in every one saying that Buckley needs to be overruled. And I think it was Justice Alito in another case saying maybe it should, but that's not the question before the court. And it seems to be the trend where restrictions like this might be going. But as it relates to this case specifically, I think it just underscores how important that special justification must be. And that is lacking here. I'm not going to concede that there's no sufficient interest in the ordinance, but accepting that for the purpose of this conclusion, the fact that there is no special justification here is a sufficient reason to grant summary judgment in plaintiff's favor. The totality of everything in the record, the fact that it's targeted at STAR, even if that doesn't undermine the government's interest, there's just nothing here to justify limits so low that are drawn arbitrarily to limit campaign spending, not just by everyone, but by one person overall. And with that, I ask the court to reverse and order the district court to enter a summary judgment in plaintiff's favor. Thank you very much for your argument. The case just argued is submitted, and we are adjourned for this session. Thank you.
judges: WATFORD, COLLINS, Murphy